JoNes, Chief Judge,
delivered the opinion of the court:
Plaintiff is the successor of a corporation known as Scripture Press, Inc., organized in 1932 as a profit corporation under Illinois law. In May 1945, the stock of Scripture Press, Inc., was donated by its stockholders to plaintiff, Scripture Press Foundation, and Scripture Press, Inc., was then liquidated into plaintiff.
Plaintiff was organized on May 5, 1945, as a nonprofit, nonstock; corporation, pursuant to the “General Not for Profit Corporation Act” of the State of Illinois. Following *465 application by the plaintiff, the Commissioner of Internal Bevenue issued a ruling in 1946 declaring plaintiff to be exempt from Federal income tax under the provisions of § 101(6) of the Internal Bevenue Code of 1939, as amended,[1] on the ground that the plaintiff was organized and operated exclusively for religious purposes.
On December 31, 1953, the Chief, Exempt Organizations Branch, Office of the Commissioner of Internal Bevenue, issued a ruling that plaintiff beginning with the fiscal year ended January 31, 1953, and for subsequent years, was not exempt from Federal taxes. Thereafter, plaintiff timely filed on March 18,1955, corporate tax returns for the taxable years ended January 31, 1953, and January 31,1954, reporting net taxable income for those years of $18,827 and $18,544, respectively, as representing profits from store operations and paid taxes for those years of $5,648.10 and $5,563.20, respectively. Plaintiff reported its store operations as taxable on the ground that amounts realized on these operations might be, although the plaintiff does not so admit, considered unrelated business as defined in §§ 421[2] and 422 [3] of the Internal Bevenue Code of 1939, as amended by the Bevenue Act of 1950, more particularly defined as Supplement U Net Income.
Thereafter, plaintiff duly filed claims for refund for taxes so paid. As no action was taken by the Commissioner of Internal Bevenue with regard to these claims, plaintiff filed suit in this court to recover these taxes. Subsequently, deficiency assessments were made by the Commissioner of Internal Bevenue, assessing taxes for 1953 at $153,058.48 and for 1954 at $173,039.63. Plaintiff paid the additional assessment of $147,410.38 for 1953, filed a timely claim for refund, supplementing the prior claim for the same year, which claim was denied by the Commissioner of Internal Bevenue. Consequently, plaintiff amended its original petition to this court to include the payment of the additional assessment for *466 the year 1953, requesting recovery of taxes for 1953, totaling $159,588.18, including interest paid, plus interest thereon. Plaintiff has elected to present its petition against the deficiency assessment for the 1954 fiscal year in the Tax Court of the United States.
All issues concerning the amount of taxes, if any, to which plaintiff might be entitled to have refunded have been reserved for future proceedings. The only issues now before the court are as follows: (1) Is plaintiff entitled to exemption from Federal income taxes under § 101(6) of the Internal Revenue Code of 1939 and § 501(c) (3)[4] of the Internal Revenue Code of 1954? (2) If the plaintiff is so exempt, is any part of its activities subject to unrelated business tax under § 421 of the Internal Revenue Code of 1939 and under § 512[5] of the Internal Revenue Code of 1954 ?
The first issue which we must resolve is whether plaintiff is exempt under § 101 (6)[6] of the 1939 Code and the equivalent provision in the 1954 Code, § 501 (c) (3)[7]. The plaintiff con *467 tends with, considerable force that the single and overwhelmingly dominant motif of its activities is the betterment of the Protestant Sunday Schools of America. In other words, plaintiff asserts that it is “operated exclusively” for a religious purpose under § 101(6). The defendant contends with equal vigor that plaintiff’s purpose is the preparation and sale of religious literature, and that it is therefore not “operated exclusively” for religious and charitable purposes. The defendant asserts that the sale of religious literature is not an activity which qualifies for tax exemption.
Before we inquire into the tax significance of plaintiff’s activities, we think it pertinent to discuss the background of plaintiff’s founders. The dominant personalities behind plaintiff and its predecessor, Scripture Press, Inc., were Mr. and Mrs. Victor Cory. Until 1925, Mr. Cory had been an electrical engineer. In that year, he and Mrs. Cory agreed to act on their deep interest in religion. Mr. Cory went to work for a religious publishing company. Gradually, Mr. Cory became concerned with what he regarded as the poor quality of existing teaching materials for Bible instruction in Sunday schools. Therefore in 1932, Mr. Victor Cory, his wife, Bernice, and others, organized Scripture Press, Inc., devoted to the preparation and sale of religious literature. Scripture Press, Inc., was succeeded by the plaintiff. The plaintiff, like its predecessor, has enjoyed a steadily increasing rate of sales over the years. The plaintiff is not connected with any particular religious denomination or church.
There is unfortunately no case law on the point as to whether a religious publishing house, lacking denominational ties, merits tax exempt status. However, there are cases involving publishing houses which are instructive. Counsel for both sides cite us to Forest Press, Inc. v. Commissioner, 22 T.C. 265 (1954). Forest Press was organized to prepare and publish a widely accepted system for indexing library collections, the Dewey Decimal Classification System. Forest Press sought exemption under the provisions of § 101(6) of the Internal Bevenue Code of 1939. The Commissioner of Internal Bevenue asserted that Forest Press was engaged in a commercial publishing enterprise and was consequently neither organized nor operated exclusively for *468 scientific, literary, or educational purposes within the meaning of § 101(6).
The Tax Court declared Forest Press exempt. The defendant urges that any comparison between Forest Press and the plaintiff can only serve to point up the nonexempt nature of plaintiff’s activities. The defendant asserts that in Forest Press the publications were priced to recover manufacturing cost plus enough to sustain the small staff of seven to ten persons working for the corporation.
The defendant distinguishes Forest Press from the plaintiff by comparing the slight profits realized by the former with the very substantial profits realized by the latter. If the defendant seeks by this distinction to suggest that where an organization’s profits are very large a conclusion that the organization is noncharitable must follow, we reject such a suggestion. If, however, defendant means only to suggest that it is at least some evidence indicative of a commercial character, we are inclined to agree.
Another case that is helpful, and perhaps more directly in point, is Saint Germain Foundations. Commissioner, 26 T.C. 648 (1956). In that case, the petitioner, the Saint Germain Foundation, sought to qualify as an organization exempt from Federal income tax under § 101(6) of the 1939 Code. The Saint Germain Foundation was organized for the purpose of propagating the teachings of the “I Am” Keligious Activity. The similarity between Saint Germain and the instant case arises from the fact that some religious literature was sold in connection with Saint Germain’s activities. The Government argued that the Saint Germain Foundation received income from the sale of religious publications and charged fees at its annual conclaves. The Government contended in Saint Germain that these income-producing activities showed that the petitioner was not “operated exclusively” for religious purposes. The Tax Court did not subscribe to the Government’s position in that situation and said on p.658:
The sale of religious literature and the conclaves held to propagate the precepts of the petitioner are activities closely associated with, and incidental to, the religious purposes of the petitioner. Such activities *469 bear an intimate relationship to the proper functioning of the petitioner, and we do not believe that income received from these activities prevents the petitioner from being an organization organized and operated “exclusively” for religious purposes within the meaning of section 101(6). Squire v. Students Book Corp., 191 F. 2d 1018; Trinidad v. Sagrada Orden de Predicadores, 263 U.S. 578. [Emphasis supplied.]
We believe the Saint Germam case suggests, at least inferentially, the test for decision in this case: was the sale of religious literature by the plaintiff in this case incidental to the plaintiff’s religious purposes? Or were plaintiff’s religious objectives incidental to the sale of religious literature? Apparently the plaintiff is convinced, as we are, that decision in this case will hinge on the answer to this question. Thus, plaintiff asserts that its fundamental objective is to stimulate the growth of the Sunday schools in the United States. The plaintiff asserts that its work toward this end comprises several phases. One phase is the plaintiff’s Editorial Division which has the responsibility for preparing and disseminating the Sunday School lesson material. Another phase is the Christian Relations Department which does door-to-door evangelism. The plaintiff describes in its brief the final phase of its work — the Instructional Department — as follows:
The most important phase, however, towards effecting this objective is performed by the Instructional Department, * * * free instructional work is provided without promoting the sale of Plaintiff-produced material, but with the primary objective * * * “to inspire, improve, instruct” for the purpose of making better and more informed Sunday School teachers and Church leaders.
We think that plaintiff’s assertion that its instructional activities are more important to plaintiff than its selling activities is entirely sincere. The evidence in this case, as is amply borne out by the findings of the trial commissioner, shows that throughout its history Scripture Press has been led by people of devout and intense religious conviction. However, the intensity of the religious convictions of the plaintiff’s members and officers cannot operate to exempt them from the tax law if the activities of the plaintiff can *470 not in themselves justify such an exemption. Piety is no defense to the assessments of the tax collector.
In our finding 49, the trial commissioner reflects the total costs incurred by the plaintiff for its instructional work at Sunday school meetings and conventions and other sessions. The plaintiff vigorously argues that its primary interest was to better the Sunday schools of America by improving both the quality of instruction and the materials used in those schools. The instructional aspect of this endeavor involved outlays of monies by the plaintiff. The betterment of the lesson material used resulted in income to the plaintiff as a result of the sale of these materials. We think it is fair in making a determination as to what was the most important aspect of plaintiff’s work to compare how much plaintiff accumulated as a result of its sales of religious literature and how much it expended for instructional activities.
Expenditures [8] for Religious Educational Programs
Accumulated[9] Capital <& Surplus
1951_$21, 835. 67 $476,311.14
1952_ 29,434. 83 585, 016.10
1953_ 36,452. 08 744, 798.26
1954_ 41, 454. 42 982, 580. 70
1955_ 46,378. 63 1,188, 629.17
1956_ 48, 041.44 1,468, 892. 42
1957_ 72,886. 27 1, 610, 817.30
We think the enormity of the contrast between what plaintiff has accumulated from sales each year and what it has expended for its educational programs reveals that the sale of religious literature is its primary activity and that its instructional phase is incidental thereto. It is true that plaintiff erected a new building in Wheaton, Illinois, at a total cost in excess of $1,000,000 in 1956. Even allowing for the cost of the building, however, the disparity between amounts *471 actually expended for instruction when compared with amounts realized in earnings is unaccountably small.[10]
The test we have developed from the Saint Germain case was first suggested by the Supreme Court in Trinidad v. Sagrada Orden, 263 U.S. 578 (1924). In Trinidad, the Court was concerned with construing paragraph G(a) and M of § II of the Act of October 3, 1913, 38 Stat. 172,180, a predecessor of §101(6) of the Internal Revenue Code of 1939. The defendant contended that the plaintiff, a Philippine corporation, was not “operated exclusively” for religious purposes because it used its properties to produce income, and traded in wine, chocolate, and other articles. The Court’s characterization of this argument has significance here; the Court said at p. 581:
In effect, the _ contention puts aside as immaterial the fact that the income from the properties is devoted exclusively to religious, charitable and educational purposes, and also the fact that the limited trading, if it can be called such, is purely incidental to the pursuit of those purposes, and is in no sense a distinct or external venture. [Emphasis supplied.]
In the language quoted above in Trinidad, the Supreme Court emphasizes that the taxpayer’s activities were “limited” and “purely incidental” to the pursuit of its religious activities. We think the Trinidad, case reflects the view that in these cases what is dispositive is whether the business activities of the taxpayer are incidental to its charitable objectives or whether, in fact, the converse is true.
We note that the Court said again at p. 582:
As respects the transactions in wine, chocolate and other articles, we think they do not amount to engaging in trade in any proper sense of the term. It is not claimed that there is any selling to the public or in com *472 petition with others. The articles are merely bought and supplied for use within the plaintiff’s own organization and agencies, — some of them for strictly religious use and the others for uses which are purely incidental to the work which the plaintiff is carrying on. That the transactions yield some profit is in the circumstances a negligible factor. Financial gain is not the end to which they are directed. [Emphasis supplied.]
Can it be said of plaintiff’s competitively-priced lesson material that financial gain was not the end to which its sale was directed? Can the impressive earnings which sale of the lesson materials has brought the plaintiff be said to be incidental to plaintiff’s primary work? We think the answer to both these questions is in the negative. Weighing the cases discussed, and analyzing them for the implications they contain for solution of the case at bar, we conclude that the sale of religious literature was the primary concern of plaintiff’s activities. We further conclude that the sale of these materials, however religiously inspired, involved the plaintiff directly in the conduct of a trade or business for profit.[11]
Plaintiff has not argued that if it does not qualify for exemption solely as a religious foundation, it qualifies for exemption as an educational foundation. However, we believe that a theory that plaintiff is exempt as an “educational” organization within the meaning of § 101(6) is subject to the same defects inherent in the position that plaintiff’s dominant purpose was religious in character. We think the plaintiff could not make a showing that its primary purpose was educational any more than it was able to make a showing that its primary purpose was religious. In Better Business Bureau v. United States, 326 U.S. 279, 283 (1945), the Court was presented with the question as to whether the Better Business Bureau of Washington, D.C., Inc., was exempt from social security taxes as a corporation organized exclusively for scientific or educational purposes within the meaning of § 811 (b) (8) of the Social Security Act, 49 Stat. 620, 639. Sec *473 tion 811(b) (8) of tbe Social Security Act repeats almost in haec verba tbe language of § 101(6) of the Internal Revenue Code of 1939. The Court there held that the petitioner was not exempt from Social Security taxes. The Court said at p. 283:
In this instance, in order to fall within the claimed exemption, an organization must be devoted to educational purposes exclusively. This plainly means that the presence of a single noneducational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes. It thus becomes unnecessary to determine the correctness of the educational characterization of petitioner’s operations, it being apparent beyond dispute that an important, if not the primary, pursuit of petitioner’s organization is to promote not only an ethical but also a profitable business community. [Emphasis supplied.]
We think the sales activities of plaintiff reflect “a noneducational purpose” and are not only “substantial in nature” but preponderate.
There is yet another facet to this case. The defendant argues that if the plaintiff should dissolve, it is possible for its earnings to be distributed to private persons, or for use for noncharitable ends. This of course is meant to suggest the possibility of inurement to private persons of the net earnings of the plaintiff, which is specifically prohibited by § 101(6). The defendant relies on the case of Scripture Press Foundation v. Annunzio, 414 Ill. 339, 111 N.E. 2d 519 (1953), wherein the Supreme Court of Illinois held that plaintiff was not exempt as a charitable foundation under § 2(f) (6) (g) of the Illinois Unemployment Compensation Act, Ill. Rev. Stat. 1949, ch. 48, par. 218. Central to the Illinois court’s determination that plaintiff was not a charitable foundation was the fact that there was nothing to prevent the foundation, upon dissolution, from disposing of the assets in any manner it chose. Plaintiff responds that this charge no longer carries with it any merit because it has since amended its charter by adding to its articles of incorporation a provision that on dissolution its assets shall go to such “religious, charitable, scientific, literary, or educa *474 tional organizations, no part of the net earnings of which, inures to the benefit of any private shareholder or individual * * * as the Board of Directors in their absolute discretion, may determine * *
Defendant’s rejoinder to plaintiff’s argument that on dissolution the Foundation will distribute its assets to charities is that the situation respecting amendment in plaintiff’s bylaws is precisely as it was at the time when those bylaws were under consideration by the Supreme Court of Illinois. Plaintiff’s articles of incorporation contain nothing, defendant urges, preventing further amendment to eliminate the provision respecting dissolution added May 20, 1951.
The possibility of inurement is of course raised by the opportunity for further amendment in plaintiff’s bylaws. We very much doubt whether at least the present officers and members of the plaintiff would so move to amend. Therefore, we have not regarded this aspect of the case as in any way determinative.
A final matter remains to be considered. The plaintiff contends that the Commissioner of Internal Eevenue was without authority to revoke the plaintiff’s exempt status previously granted in 1946. Apparently plaintiff’s theory is that once the Commissioner of Internal Eevenue has issued a ruling he is forever precluded from revoking it. Plaintiff has adduced no authority to support this contention. We know of no limitation on the Commissioner of Internal Eevenue precluding him from revoking plaintiff’s exempt status in 1953 because he found then, as we find now, that plaintiff did not come within the meaning of § 101(6). See Automobile Club v. Commissioner, 353 U.S. 180 (1957). Consequently, we think there is no merit in plaintiff’s position on this point.
Since we find that Scripture Press Foundation’s activities do not warrant tax exemption, we do not reach the issue as to whether any single part of those activities are subjected to Unrelated Business Tax under the provisions of § 421 of the Internal Eevenue Code of 1939, as amended, and under the provisions of § 512 of the Internal Eevenue Code of 1954.
In summary, we are compelled to reach a conclusion that plaintiff’s activities are of a nonexempt character. We find *475 that the crucial factor, in the light of the evidence, is that the sales aspect of plaintiff’s work looms so large as to overshadow all else.
Therefore, plaintiff’s petition will be dismissed insofar as it claims an exemption under section 101(6) of the Internal Revenue Code of 1939, sufra. The case will be remanded to the trial commissioner for further proceedings on plaintiff’s remaining claims.
It is so ordered.
Durfee, Judge; Laramore, Judge; Madden, Judge; and Whitaker, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Trial Commissioner Roald A. Hogenson, makes the following findings of fact:
1. Plaintiff was organized on May 5,1945, as a non-profit, non-stock corporation, pursuant to the “General Not For Profit Corporation Act” of the State of Illinois, approved July 17, 1943. Its principal office at the time of the filing of its original petition was at 434 South Wabash Ave., Chicago, Illinois. In November 1956 plaintiff moved its headquarters to 1825 College Avenue, Wheaton, Illinois.
2. In its original petition filed March 6, 1956, plaintiff claimed refund of Federal income tax and interest payments of $12,177.80 made on or about March 18, 1955, for its fiscal years ended January 31, 1953 and 1954.
On March 15, 1957, prior to the trial of this case, the Commissioner of Internal Revenue mailed plaintiff a 90-day letter containing notice of deficiencies of Federal income taxes in the sums of $147,410.38 fo,r the fiscal year ended January 31, 1953, and $167,476.43 for the fiscal year ended January 31, 1954. This notice was received by plaintiff on March 18,1957.
On May 9, 1957, plaintiff paid under protest the $147,410.38 covering the deficiency assessment for the fiscal year ended January 31, 1953. On July 10, 1957, plaintiff filed its first amendment to its petition in this case, by which it increased its claim for judgment to the sum of *476 $159,588.18 by including the payment of $147,410.38 of additional taxes for the 1953 fiscal year. Plaintiff has elected to present its petition against the deficiency assessment for the 1954 fiscal year in the Tax Court of the United States.
3. By stipulation of the parties, approved by the trial commissioner of this court, the only issues now before the court are as follows: (1) Is plaintiff entitled to exemption from Federal income taxes under Section 101(6) of the Internal Eevenue Code of 1939 and Section 501(c)(3) of the Internal Eevenue Code of 1954. (2) If the plaintiff is so exempt, is any part of its activities subject to unrelated business tax under Section 421 of the Internal Eeve-nue Code of 1939, as amended, and under Section 512 of the Internal Eevenue Code of 1954. All issues pertaining to the amount of recovery, if any, have been ¡reserved for future proceedings.
At the outset of the trial of this case, the attorneys for the parties agreed that the entire period of plaintiff’s operations, before, during, and after the tax years in question, should be considered on the issues now presented.
4. Plaintiff’s original articles of incorporation stated that it was incorporated for perpetual duration. Its incorpora-tors were Victor E. Cory, Bernice T. Cory, and Harry G. Saulnier, who were designated as the first board of directors, which was to be comprised of three members. Ee-garding the purposes for which the corporation was organized, the articles provided as follows:
The dissemination of the Gospel, the distribution of the Scriptures, of extracts therefrom, of devotional and other literature relating thereto, and of helps and supplies for use in Christian activities.
The organization and support of organizations, institutions and movements exclusively devoted to Christian missionary, educational and other evangelical efforts.
In connection with the foregoing to engage in:
1. The production, purchase, circulation, distribution, and sale of Christian literature, including books, periodicals, pamphlets, tracts, placards, mottos, and supplies; and
2. The conduct of publication and printing establishments.
*477 5. Plaintiff’s original bylaws, which, have been amended only in the particulars hereinafter stated in this finding, provided in pertinent parts as follows:
ARTICLE I. ORGANIZATION
* * * ❖ #
Section 2. Purposes. The purposes of this corporation are as stated in its Articles of Incorporation, namely: The dissemination of the Gospel, the distribution of the Scriptures, of extracts therefrom, of devotional and other literature relating thereto, and of helps and supplies for use in Christian activities; the organization and support of organizations, institutions, and movements exclusively devoted to Christian missionary, educational and other evangelical efforts; the production, purchase, circulation, distribution, and sale of Christian literature, including books, periodicals, pamphlets, tracts, placards, mottos, and supplies; and the conduct of publication and printing establishments.
Section 3. Diversion of assets prohibited. In no case shall the corporation distribute to its members, directors, or officers any of its income or any of its properties, provided, however, that it may pay to any members, officers, or directors, who shall render services for it, reasonable compensation for services actually rendered. No funds of the corporation shall be loaned to any member, officer or director.
* * * * *
ARTICLE II. MEMBERSHIP
Section 1. Members. The initial members of this corporation shall be subscribers to its Articles of Incorporation, namely: Victor E. Cory, Bernice T. Cory, and Harry G. Saulnier. Additional members shall be admitted from time to time on a two-third vote of the members at the times of their admissions. Members once admitted shall continue to be such until their death, disability, or resignation. All of the members shall be of one class, and each shall have one vote on all matters coming before the members’ meetings.
*****
ARTICLE HI. BOARD OP DIRECTORS
Section 1. Number of directors. The initial Board of Directors shall consist of the three persons named in the Articles of Incorporation. Thereafter the number *478 of directors shall continue to be three until a different number is fixed by amendment to these by-laws. Thereafter the Board of Directors shall be such number of persons, not less than three, as from time to time may be specified by these by-laws.
Section 2. Election of directors. The initial directors shall hold office until the next annual members’ meeting. Thereafter the directors shall be elected at each annual meeting, and those elected shall hold office until the next annual meeting and until their successors are elected and shall have qualified. Vacancies occurring between annual meetings may be filled by the Board.
•}• «i» *}♦ «H
ARTICLE V. EXECUTIVES’ ADVISORY COMMITTEE
Section 1. Membership. The Board of Directors shall provide for the organization of an Executives’ Advisory Committee, which shall consist of the occupants of such executive positions as the Board may designate. Such Committee shall report quarterly to the Board of Directors as to the problems and activities of the corporation with its recommendations.
Section 2. Procedure of Executives’ Advisory Committee. The Executives’ Advisory Committee shall formulate its own rules of procedure, elect its own officers, and keep its own records. Action taken by it shall be subject to the approval of the Board of Directors and shall not be binding upon the corporation as against other persons unless and to the extent that it may be expressly concurred in by act of the Board of Directors or of some officer acting within the scope of the powers conferred upon him by these By-Laws or by resolution of the Board.
On August 28,1947, Section 1 of Article III was amended retroactive to May 9, 1945, to provide that the board of directors consist of five persons.
The original bylaws provided in Section 1 of Article IV that the officers of the corporation would be a president, a vice president, a secretary, and a treasurer, any two of which offices, except those of president and vice president, could be occupied by the same person. On November 28, 1955, this section was amended to provide for such additional vice presidents, assistant secretaries, assistant treasurers, and other officers as the board of directors might *479 from time to time deem advisable. Officers were elected annually by the board of directors.
6. By action of its board of directors, approved by the members of the corporation, plaintiff’s original articles of incorporation were amended on January 29, 1954, to eliminate the organizational purpose of a printing establishment, which plaintiff never conducted, and the corporate purposes were then restated as follows:
To use its funds exclusively for religious, charitable, scientific, literary, or educational purposes, so that no part thereof shall inure to the benefit of any member or individual having a personal and private interest in the activities of the corporation; and to make any gift or gifts to other corporations or associations organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, no part of the net income or which inures to the benefit of any private shareholder or individual having a personal or private interest in the activities of the corporation; provided, no substantial part of the funds of the corporation shall be used to carry on propaganda, or otherwise influence legislation.
To receive and maintain a fund or funds and apply the income and principal thereof to promote the dissemination of the Gospel, the distribution of the Scripture, of extracts therefrom, of devotional and other literature relating thereto, and of aids and supplies for use in Christian activities.
To receive and maintain a fund or funds and apply the income and principal thereof to the maintenance and operation of classes, seminars, and schools in religious instruction, and the creation and establishment of scholarships in religious education.
To receive and maintain a fund or funds and apply the income and principal thereof to. promote the organization and support and assist organizations, institutions, and movements exclusively devoted to. Christian missionary, educational, and other evangelical efforts.
To take and hold by bequest, devise, gift, purchase, or lease, for any of its purposes, any property, real or personal, without limitation as to amount or value; to convey such property and to invest and reinvest any such property and any increase or income therefrom, and deal with and expand the income and principal of said corporation in such manner as in the Judgment of its members or directors will best promote its objects.
*480 To do any and all acts necessary in furtherance of its corporate objects aforesaid, such as the formulation, editing, purchase, circulation, distribution, and sale of Christian literature, including books, periodicals, pamphlets, placards, mottos, and supplies for Christian activities.
At the same time, the board of directors with the approval of the members of the corporation amended plaintiff’s original articles of incorporation by adding the following article:
6. In the event of the dissolution of the corporation, after the payment or satisfaction of all the debts of the corporation, the remaining assets and funds of the corporation shall be conveyed or transferred to such religious, charitable, scientific, literary, or educational organization or organizations, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda or otherwise attempting to influence legislation, as the Board of Directors in their absolute discretion, may determine and no funds or property shall be distributed among or revert to any member, officer, or director of this corporation.
No provision was contained in the original articles concerning distribution of plaintiff’s assets in the event of dissolution.
7. The first meeting of plaintiff’s board of directors and members was held May 9, 1945, at which time the bylaws were approved and adopted. William R. Thomas and Robert A. Walker were affirmed as additional members of the corporation and of the board of directors.
On the same day the board of directors elected Victor E. Cory as president, Bernice T. Cory as vice president, and Harry G. Saulnier as secretary, which positions they have held since that time. These persons were the incorporators of plaintiff and held the same offices in Scripture Press, Inc., the predecessor corporation hereinafter mentioned in this and subsequent findings. Mrs. Cory was also elected plaintiff’s treasurer, but the duties were actually performed by a controller.
*481 William R. Thomas was a director of the predecessor corporation and vice president of the Geographical Publishing Company of HeKalb, Illinois. He had assisted in financing the predecessor corporation in its early years of operation. Robert A. Walker had been in charge of sales of publications for the predecessor corporation and headed plaintiff’s dissemination division.
The same officials and employees of the predecessor corporation continued similar duties for plaintiff.
At the annual meeting of the members and board of directors on January 10, 1958, the bylaws were amended to provide for not less than 3 nor more than 15 directors. The board then increased its membership from five to seven and appointed Casper Henning and Hr. Robert A. Cook as directors.
Mr. Henning was then a vice president and Chicago manager of Manufacturers Mutual Fire Insurance Company and chairman of the board of Pacific Garden Missions. He had been the national treasurer of the Gideons for a number of years.
Hr. Cook had been previously elected as a vice president in charge of plaintiff’s dissemination division, commencing in February 1957, succeeding Robert A. Walker. He is and has been an ordained minister since 1931, having graduated from Moody Bible Institute in 1930, received a bachelor of arts degree from Wheaton College in 1934, a bachelor of divinity degree from Eastern Baptist Seminary in 1939, and thereafter two doctors degrees in theology. He served as a minister in several churches from 1932 to 1948. In 1945 he became active in Youth for Christ International, and served from October 1948 to February 1957 as its president.
At the time of the trial of this case, plaintiff had a board of directors with seven members, with an authorized maximum of fifteen members.
8. On May 9,1945, at their first meeting, the original members and directors recorded in their minutes that all of the stock of the predecessor corporation, Scripture Press, Inc., was being contributed to plaintiff, that as soon as possible, the business and assets of the predecessor corporation would *482 be turned over to plaintiff, and that plaintiff would thereafter carry out the development and distribution of religious literature, and the organization of religious movements, particularly relating to Sunday schools, as an objective in itself, and not as a business for profit. Plaintiff’s president was then authorized by resolution to vote the stock of the predecessor corporation in favor of liquidation of that company, and it was further resolved that plaintiff’s officers devote all assets received in such liquidation to the furtherance of plaintiff’s purposes.
The liquidation of the predecessor corporation was completed as of May 81,1945, and plaintiff’s functions continued thereafter.
9. In May 1945 plaintiff submitted its application to the Commissioner of Internal Revenue, claiming exemption from Federal income taxes under Section 101(6) of the Internal Revenue Code of 1939. It was submitted on Treasury Department Form 1023, entitled “Exemption Affidavit”, and was executed by plaintiff’s president. This printed form required information in specific categories, and as completed by plaintiff stated in pertinent parts as follows:
_ 2. Is the organization the outgrowth or continuation of any form of predecessor? Yes If so, state the name of such predecessor and the period during which it was in existence. Scripture Press, Inc., existed, from 1932 u/ntil this time. This Foundation has acquired all of the stock of Scripture Press, Inc. hy contribution. That corporation is presently to he liquidated a/nd this Foundation will take over all its assets.
4. State briefly the specific purposes for which the organization was formed. (Do not quote from, * * *) To promote religious education in all appropriate ways, especially through the circulation of religious literature and helps especially adapted to Church Schools.
8. State all sources from which the organization’s income is derived. It is anticipated that income will he derived from the production and sale of Christian literature, particularly of literature adapted for Sunday Schools and Sunday School workers.
10. State all the activities in which the organization is presently engaged. (Explain in detail, * * *) At present the organization is merely holder of all the stock of The Scripture Press, Inc. However, that *483 Corporation has for some years been publishing Sunday School helps, literature for Sunday School worhers arid devotional literature generally. This organisation intends to take over these activities.
Furthermore, The Scripture Press, Inc. has promoted and arranged, and this organization expects to promote and arrange, Sunday School worhers’ conferences and conventions.
13 (a) For what purposes, other than, in payment for services rendered or supplies furnished, are the organization’s funds expended? To the extent that they are not required for its own direct religious activities, this organization expects to devote its funds to the support of Christian missionary and evangelical movements.
(b) If any payments are made to members or shareholders for services rendered the organization, attadh a separate statement showing the amounts so paid and the character of the services rendered. No payments made as yet. Two of the members will be full time salaried employees. Names and probable salaries are: Victor E. Cory $10,000 per year. Bernice T. Cory $6,000 per year.
14. Does any part of the net income of the organization inure to the benefit of any private shareholder or individual: No.
16. In the event of the dissolution of the organization, what disposition would be made of its property? It would go to some appropriate organization or organi-ations for use m carrying on Christian and missionary activities.
Plaintiff also submitted with this exemption affidavit copies of its charter and bylaws. Not having commenced operations, plaintiff could not submit a classified statement of receipts and disbursements and a statement of assets and liabilities, as required by the terms of the exemption affidavit.
10. By letter dated June 16, 1946, the Deputy Commissioner of Internal Kevenue acknowledged receipt of plaintiff’s application and therein advised plaintiff in pertinent part as follows:
Eulings, of the Bureau with respect to the exempt status of corporations for Federal income tax purposes are. based largely on the actual activities of the organization over a period of time sufficient to disclose clearly the method of operation and actual activities. Ac *484 cordingly, no ruling will be made at this time. If, after you have operated for a period of time sufficient to disclose clearly the method of operation you will submit an exemption affidavit, Form 1028, completely filled out, accompanied by the supporting documente specified therein, to the collector of internal revenue, further consideration will be given to your claim. In the absence of a ruling holding that you are exempt from Federal income tax, it will, of course, be necessary for you to file income tax returns as they become due with the collector of internal revenue for your district, who is being advised of this action.
Plaintiff did not file any Federal income tax return for its first year of operations, or for any part thereof. On July 16, 1946, a representative of plaintiff conferred with an official of Internal Revenue Service concerning submission of another exemption affidavit, and plaintiff was then allowed an extension of time to file a tax return.
11. On August 28, 1946, plaintiff submitted a new application for exemption from Federal income taxes on Treasury Department Form 1023, attaching its balance sheet as of May 31, 1946, and a statement of its operations for its first year ended on that date. Plaintiff also submitted its catalog and samples of its materials published for sale to Sunday Schools which elect to use them in religious education. The information submitted by plaintiff in the new exemption affidavit was substantially the same as submitted on the original application, including the fact that plaintiff was successor to Scripture Press, Inc.
12. Plaintiff’s balance sheet as of May 31,1946, as submitted to the Commissioner of Internal Revenue, is summarized as follows:

Assets

Gash on hand and in bank- $203. 84
Accounts receivable_ 60, 996. 75
Inventories, consisting of lessons, lesson materials and catalog merchandise_ 95, 572.17
Fixed assets, net of depreciation_ 29, 304. 63
Deferred charges_ 27, 581. 87
Other assets_ 5, 664. 93
Total assets. 219, 324.19

*485
Liabilities

Accounts and notes payable_ 159, 036. 56
Accrued expense_ 13,220. 99
Deferred income on sales_ 13, 550.46
Total liabilities_ 185, 808. 01
Capital _$30,710.11
Surplus_ 2,806.07
- 33,516.18
Total liabilities and capital_ 219, 324.19
The capital of $30,710.11 represents the book value of net worth taken over from Scripture Press, Inc. The surplus of $2,806.07 represents the net income as reported from operations for the year ended May 31,1946.
The assets include as a part of the deferred charges, $13,010.49 of prepaid publicity expense, and $8,675.27 of deferred expense for week day church school, and include in the item of other assets, $4,518.76 for tax claims against the defendant. Royalties in the sum of $9,418.03 are included in the liability item of accrued expense.
13. Plaintiff’s operating statement for the year ended May 31,1946, as submitted to the Commissioner of Internal Revenue, is summarized as follows:
Net sales (after returns and allowances)_ $640,794.60

Less

Cost of sales- $334,412.75
Mdse, handling costs_ 77,323. 81
Distribution expenses_ 92, 607.46
Administrative & general expense_ 137,769.17
642,113.19
Net operating deficit_
—1,318. 59

Le&uct

Net foundation expenses_ $834.75
Sunday School conventions_ 1,485. 97
Contributions & appropriations to outside agencies for Christian work_ 1,822.46
Other expense_ 115. 81
$4, 258. 99
Sunday Magazine operations_
748.56
Total of other deductions_ 5, 007.55
Total loss from all functions_ —6, 326.14
Add: Proceeds from the sale of Sunday Magazine_ 9,132.21
Excess of income over expense. 2, 806.07
*486 The credit of $9,132.21 from the sale of Sunday Magazine represents a credit to surplus as shown by the facts concerning such sale, hereinafter stated in findings 28 and 29. It does not represent income for the year ended May 31, 1946.
Plaintiff reported total expenditures for direct Christian work of $12,934.26, the major items of which are as follows: $834.75 allocable to planning Sunday school conventions, $1,485.97 for holding and assisting in programming meetings of Sunday school workers and teachers, $1,822.46 as contributions to religious organizations, and $8,675.27 for developing a curriculum for week day church schools. The last item is the deferred expense charge previously mentioned in finding 12. In supplying details on these expenditures for direct Christian work, plaintiff stated that it was not meant to infer that the other activities of plaintiff were not religious, but asserted that all of its activities and all of its expenditures were for religious purposes.
Of the $12,934.26 expended for direct Christian work, $4,258.99 was actually charged to plaintiff’s operations during the year ended May 31, 1946, which sum represents less than 1 percent of its net sales.
Plaintiff’s expense for the promotion of Christian literature for the year ended May 31,1946, amounted to $60,092.25, which sum represented almost 10 percent of its net sales, not counting the additional prepaid publicity expense of $13,010.49. It was apparent that plaintiff expected to increase substantially its sales of Christian literature and allied materials in future operations.
14. By letter to plaintiff dated September 11, 1946, the Commissioner of Internal Revenue allowed plaintiff’s application for tax exemption as follows:
It is the opinion of this office, based upon the evidence presented, that you are exempt from Federal income tax under the provisions of section 101(6) of the Internal Revenue Code and corresponding provisions of prior revenue acts, as it is shown that you are organized and operated exclusively for religious purposes.
Accordingly, you will not be required to file returns of income unless you change the character of your organization, the purpose for which you were organized, or your method of operations. Any such changes *487 should be reported immediately to the collector of internal revenue for your district in order that their effect upon your exempt status may be determined.
Furthermore, under substantially identical authority contained in sections 1426 and 1607 of the Code and/or corresponding provisions of the Social Security Act, the employment taxes imposed by such statutes are not applicable to remuneration for services performed in your employ so long as you meet the conditions prescribed above for retention of an exempt status for income tax purposes.
Contributions made to you are deductible by the donors in arriving at their taxable net income in the manner and to the extent provided by section 23 (o) and (q) of the Internal Eevenue Code as amended, and corresponding provisions of prior revenue acts.
Bequests, legacies, devises or transfers, to or for your use are deductible in arriving at the value of the net estate of a decedent for estate tax purposes in the manner and to the extent provided by sections 812(d) and 861(a) (3) of the Code and/or corresponding provisions of prior revenue acts. Gifts of property to you are deductible in computing net gifts for gift tax purposes in the manner and to the extent provided in section 1004(a) (2) (B) and 1004(b)_ (2) and (3) of the Code and/or corresponding provisions of prior revenue acts.
The collector of internal revenue for your district is being advised of this action.
15. Subsequent to this ruling, plaintiff was included on the official list of the Bureau of Internal Revenue of organizations exempt from taxes under Section 101 (6) of the Internal Revenue Code of 1939. Contributions to such organizations are deductible by donors for Federal income tax purposes.
16. Plaintiff filed no annual information returns with the Commissioner of Internal Revenue because as an exempt religious organization, it was not required to do so.
17. On October 6, 1953, plaintiff received the following letter from the Chief of Section, Exempt Organizations Branch, Office of the Commissioner of Internal Revenue:
Reference is made to our ruling of September 11, 1946, holding you to be entitled to exemption from Federal income tax under the provisions of section 101 (6) of the Internal Revenue Code.
*488 In view of recent changes in revenue legislation subsequent to the issuance of such ruling, it is necessary to reconsider your status at this time. Accordingly, it is requested that you submit the following information:
1. A brief statement of the type of material and literature published and/or sold by you.
2. A statement as to whether you are affiliated with any particular church group or denomination and, if so, the manner of such affiliation and the extent of the control of such group or denomination over your activities.
3. The names of your present officers and directors, and by whom these individuals were elected or selected.
4. Classified financial statements showing your receipts and disbursements for the years 1951 and 1952 and your assets and liabilities as of the close of each year.
5. The amounts distributed, if any, of your profits for religious purposes or to religious groups, and the names thereof during your last two years of operation.
The information requested herein should be furnished within thirty days for the attention of T :S :E05-MEM.
18. Having been allowed additional time to submit the required information, plaintiff by letter dated November 5, 1953, advised the Commissioner of Internal Eevenue in part as follows:
1. Type of material and literature published by Scripture Press Foundation, — also nature of its activities:
We prepare, publish and distribute quarterly, monthly and weekly, manuals, books, pamphlets, papers, magazines and supplies of all kinds for the use in Sunday Schools and Churches of all denominations for the purpose of aiding instruction in the Word of God.
In addition to this we organize, supervise, aid in, and conduct institutes and conventions for training teachers in Christian Sunday Schools, Daily Vacation Bible Schools and other Church Schools.
2. Glmrch affiliation:
The Foundation is not affiliated with any particular church group or denomination. The Foundation is truly inter-denominational in that it serves presently churches in approximately fifty-two (52) different denominations.
5. Distribution of profits:
We do not make any distributions of profits as such. We endeavor to maintain a sound financial condition. We find ourselves compelled to shortly give up made- *489 quate .rented quarters in Chicago; and we are seeking to procure finances for a suitable headquarters building outside the City. We have started a reserve toward its cost.
We treat as a part of our current expense the amounts which we expend directly for religious purposes without requiring or seeking any direct return. These are shown on Schedule 5. In addition, we serve churches generally on as near a sound cost basis as we think we conservatively can.
Plaintiff also submitted the required financial statements of its operations for the fiscal- years ended January 31, 1952 and 1953, summaries of which are as follows:

1952 195S

Net sales_ $1,675,819.59 $1,964,520.60

Less

Cost of sales_ 790, 984. 88 876, 529.46
Merchandise handling expense_ 197,980. 02 213,348.18
Distribution expense_ 281, 256.14 305, 689.74
Administration & general expenses_ 308, 998. 07 372, 748.19
Other expense_ 15, 798. 05 27, 562. 05
Total deduction. 1, 595, 017.16 1, 795, 877. 62
Net income_ 80, 802.43 168, 642.98
In the fiscal year ended May 31, 1946, plaintiff had reported expenditures of $4,258.99 for contributions to religious organizations and conventions and other such functions. For the fiscal year 1952, similar expenditures were reported at $36,764.69, and for 1953 at $48,317.26, somewhat less than 2.5 percent of net sales.
19. Plaintiff’s balance sheets at the close of its fiscal years ended January 31, 1952 and 1953, as reported to the Commissioner of Internal Kevenue, are summarized as follows:
Assets 1952 1955
Cash_ $48, 685. 82 $49, 787. 35
Government securities_ 40,125.92 140, 621.10
Accounts receivable_ 146, 865.98 173, 732. 06
Inventories_ 286, 207.75 288,901. 69
Furniture, fixtures & leasehold. 89, 324.33 105,606. 64
Deferred charges_■_ 56, 560. 80 70,166. 89
Other assets_ 658.13 658.13
Total assets_ 668,428.73 829,473. 86

*490
Liabilities 1952 195S

Accounts payable_ $97,272. 02 $91,347.42
Accrued payroll, deferred income & other liabilities_ 21,776.38 20,103.13
Capital_ 400,000.00 400,000.00
Unallocated earnings_ 149,380.33 318,023.31
Total liabilities & capital_ 668,428.73 829,473.86
Plaintiff advised that it had started a reserve toward the acquisition of a suitable building for its headquarters outside of the city of Chicago, and had increased its capital account to $400,000 as explained hereinafter in finding 51. During the 1952 fiscal year, plaintiff invested $40,000 in Government securities, and in the 1953 fiscal year, an additional $100,000.
20. By letter dated December 31, 1953, received by plaintiff on January 4, 1954, the Chief, Exempt Organizations Branch, Office of the Commissioner of Internal Revenue, issued a ruling that plaintiff, beginning with the fiscal year ended January 31, 1953, and for subsequent years, was not exempt from tax. Pertinent parts of this ruling are as follows:
A review of the information before us shows that your primary activity in furtherance of your principal purpose is the publication and sale of religious publications, periodicals and supplies. Although such materials may be necessary in the carrying out of the various religious functions of the groups purchasing them, the manufacture and supply thereof does not constitute a religious activity in itself but is a business of a kind ordinarily carried on for profit.
Section 101 of the Code provides that an organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under any paragraph of such section on the ground that all of its profits are payable to one or more organizations exempt from tax.
Accordingly, since your primary activity is to carry on a business of a kind ordinarily conducted for profit, notwithstanding that it is your intention to operate at or near cost, it is necessary to hold that you are not entitled to exemption from Federal income tax under section 101(6) of the Code. _ Accordingly, our ruling of September 11, 1946, is modified to hold that beginning with the fiscal year ended January 31,1953 and for sub *491 sequent years you are not exempt from tax. You are required, therefore, beginning with the fiscal year ended January 31,1953 and for subsequent years, to file income tax returns on Form 1120.
Plaintiff was allowed 30 days to file a protest against the ruling.
21. Under date of April 28, 1954, having been granted extensions of time, plaintiff filed a written protest to the adverse ruling of the Commissioner of Internal Revenue.
By letter to plaintiff, dated December 31, 1954, the Commissioner of Internal Revenue advised of the consideration of the protest and affirmation of the ruling, as follows:
Our ruling was premised on the ground that your primary activity, which is the publication and sale of religious publications, periodicals and supplies, constitutes a business of a kind ordinarily carried on for profit, thereby precluding your exemption from tax.
You have submitted that your entire function lies in the field of religious education through the provision to Sunday -Schools and Churches of various denominations of religious materials and tools at the lowest possible cost. You point out that the majority of the items distributed and sold by you are prepared and developed by your staff, which spends much time in researching in new and more efficient religious techniques. Though you have accumulated a surplus, such surplus is retained for the purpose of continuing to furnish such materials and to carry on your religious activities for which you have no receipts. A part of your surplus is also being accumulated in a building fund.
With respect to religious activities which you state are conducted by you without remuneration therefor, you indicate that such activities include religious counselling and advice given to Church Associations, Pastors and Sunday Schools concerning religious instruction, Bible Class and Sunday School work, advice and counselling to Church Conventions and Convocations and preparation sessions for Vacation Bible Schools, the furnishing of speakers and chorale groups for various religious functions and future plans for translation of your publications into foreign languages for use of missionaries and the creation of religious scholarships.
You submit that your own publications which consist of various series of Sunday School lessons, Bible Series lessons, and other similar materials, for Sunday School *492 and Bible vacation schools are unique in that they are entirely originated and created by your staff. You state that they are truly great religious works and constitute a religious activity. Concerning the other materials and supplies that are distributed but not prepared by you, you consider that they are part of the tools of your religious activity and are related thereto. You therefore contend that you are not a publishing business in the sense of a business carried on for profit in that you do not operate a printing business, you do not deal with the public, and your activities include the creation and origination of your own religious educational material and curricula, the conduct of religious research, and religious counseling and advice to Pastors, Sunday School Súper-intendents and Sunday School teachers.
We have carefully considered the arguments advanced in support of your contention that you are a religious organization within the meaning of section 101(6) of the Code of 1989, now described in section 501 (c) (3) of the Code of 1954, and are entitled to exemption thereunder. We are of the opinion, however, that the conclusion reached in our prior ruling is correct. Notwithstanding that the majority of the materials sold by you are prepared by members of your own staff as a result of their own research and creative endeavor, the preparation and sale thereof is not a religious activity within itself but is secular in nature. The fact that such materials and equipment may be necessary to and are used by the religious bodies purchasing them in their various fields of religious activity does not cause their publication and sale to become a religious operation any more than any other commercial service afforded a church or church group.
Though you indicate that your organization does not have all the characteristics of the ordinary commercial publishing firm, in that you carry on activities other than publishing and selling which may be considered religious, it is shown that your primary activity consists of your publishing operations. Since your primary activity consists of conducting a commercial enterprise, as stated in our prior ruling, you cannot qualify for exemption. The fact that your profits are retained for the purpose of continuing your activities or building a new building and upon dissolution your assets would be distributed for exempt purposes does not obviate the conclusion that you are engaged primarily in business activities.
*493 Accordingly, onr ruling of December 31,1953, that you are not exempt from Federal income tax and are required to file income tax returns on Form 1120, beginning with the fiscal year ended January 31, 1953, is hereby affirmed.
22. On or about March 18, 1955, plaintiff filed with the District Director of Internal Eevenue, Chicago, Illinois, Federal income tax returns for the fiscal years ended January 31, 1953, and 1954. These tax returns reflected net income of $164,801.95 for the 1953 fiscal year and $243,831.10 for the 1954 fiscal year. Plaintiff, however, claimed for deduction from such income the sums of $145,974.95 for the 1953 fiscal year and $225,287.70 for the 1954 fiscal year under Section 101 of the Internal Eevenue Code, and reported net taxable income of $18,827 for 1953 and $18,544 for 1954. The net taxable income so reported represented profits from the sale of Christian literature and related merchandise in plaintiff’s store operations, which plaintiff classified as unrelated business income as defined in Sections 302, 421 and 422 of the Eevenue Act of 1950, more particularly defined as Supplemental U net income. On the net taxable income so reported, plaintiff paid income tax of $5,648.10 for 1953, and $5,563.20 for 1954 when the returns were submitted.
On March 23, 1955, plaintiff submitted claims to the Commissioner of Internal Eevenue for refund of these taxes so paid. No action having been taken upon the claims, plaintiff filed its original petition in this Court on March 6,1956, to recover such tax payments with interest.
Thereafter, deficiency assessments were made for the fiscal years 1953 and 1954, as related in finding 2. The Internal Eevenue Service not only restored to net income the sums excluded by plaintiff as non-taxable income, but made additional adjustments, and increased net income for the 1953 fiscal year to $226,512.11, and for the 1954 fiscal year to $260,751.35, upon which taxes were computed of $153,058.48 for 1953, and $173,039.63 for 1954.
Having paid the additional assessment of $147,410.38 for the fiscal year ended January 31, 1953, plaintiff on May 8, 1957, filed a timely claim for refund, supplemental to the *494 previous claim filed for the same year, but covering all Federal income taxes paid by plaintiff for that year in the sum of $153,058.48. This claim was denied by the Internal Revenue Service on May 22,1957, and plaintiff’s first amendment to petition was filed on July 10, 1957, to include the payment of the deficiency assessment of $147,410.38 for the fiscal year ended January 31,1953.
23. Plaintiff’s predecessor, Scripture Press, Inc., was an Illinois corporation organized on October 10, 1932, as a profit organization, with an authorized capital of $3,000 consisting of 300 shares of common stock at $10 per share. Paid in capital of $1,500 was provided by the incorporators and stock was issued to them in the amounts of 99 shares to Victor E. Cory, 50 shares to Lloyd B. Tucker, and 1 share to Harry G. Saulnier. Thereafter additional capital of $1,000 was paid in, and the total amount for which capital stock was issued was $2,500.
The primary objective of Scripture Press, Inc., was the publication and dissemination of the All Bible Graded Series of Sunday School lessons conceived and composed by Dr. Clarence H. Benson, for the improvement and furtherance of Christian education in the Protestant Sunday Schools, as more hereinafter related. The lesson material was prepared in series according to age groupings of children from 4 to 18 years in attendance at Sunday School. Although published and distributed quarterly, lesson material was prepared and dated for each Sunday of the quarter. It was revised and improved from year to year.
24. The officers of Scripture Press, Inc., were Victor E. Cory, president, Lloyd B. Tucker, treasurer, and Harry G. Saulnier, secretary. Mr. Cory’s wife, Bernice T. Cory, became vice president about 1944. Mr. Tucker was Mrs. Cory’s father, and Mr. Saulnier was married to Mrs. Cory’s sister.
The board of directors of Scripture Press, Inc., consisted of Mr. and Mrs. Cory, Mr. Saulnier, and William R. Thomas. Mr. Thomas is the same person previously mentioned in finding 7.
Following the organization of Scripture Press, Inc., Mr. Cory arranged for the purchase and installation of print *495 ing press machinery and equipment at 829 Orleans Street, Chicago, Illinois, the first place of business of the company. The entire corporate capital of $2,500 was applied as a down payment on this machinery and equipment. After unsuccessful operations by the company for about a year, this equipment was repossessed and removed by the vendor, and the company lease of the premises was terminated. Thereafter, neither this company nor the plaintiff ever performed any printing, but all such work was contracted to independent printing establishments.
The Corys had been and have remained firm in their religious belief and conviction that they had a Christian mission to provide and disseminate improved Sunday School teaching and lesson materials, and by this and related means to advance and improve Christian education. Despite initial failure, Mr. Cory continued to operate from lfis home, and prepared samples of lesson materials and contacted Sunday School leaders and representatives at meetings and conventions, and eventually obtained subscriptions sufficient to justify publication of the first quarterly series of teaching manuals and lesson materials. This series was for the last three months of 1934, and consisted of 34,000 lessons. For the same quarters of 1935 and 1936, the issues were respectively 84,000 and 112,000. Thereafter, the publication and distribution of teaching manuals and lesson materials progressively increased and by 1938 had become a profitable operation.
25. During the first several years of operations substantially all work was performed by Mr. and Mrs. Cory. At the commencement of Scripture Press, Inc., they had a family of four sons, the youngest of whom was 3 years of age. From 1932 to 1936, Mr. Cory had no regular salary from the business, and his savings, and an inheritance from his father were consumed in this period of operations. He was able to provide his family only with the bare necessities of life. The company’s assets and operating deficits prohibited an adequate credit rating.
During these years financial assistance was rendered to the operations by Mr. W. It. Thomas who was otherwise never active in its affairs. An insurance policy on the life of Mr. *496 Cory was purchased and maintained for the benefit of the company for the protection of creditors. Following the organization of plaintiff, it was determined that plaintiff’s resources were' adequate and that this life insurance policy was no longer necessary. With approval by its board of directors, plaintiff sold the policy to Mr. Cory for its cash surrender value of $1,600.
At the time of plaintiff’s organization, Mr. and Mrs. Cory owned all of the outstanding stock of Scripture Press, Inc., except the one qualifying share held by Mr. Saulnier. No dividends were ever declared or paid to the stockholders of Scripture Press, Inc. No fees or other compensation were paid to any member of the board of directors for services thereon.
26. In 1934 Scripture Press, Inc., rented office space in a rooming house at 741 North LaSalle Street, Chicago, Illinois. It consisted of one small room, where all operations were carried on for about eight months, when an additional room was obtained. By 1937 the organization consisted of six employees, and the gross volume of business had reached about $100,000 per year. The company’s operations were then moved to 800 North Clark Street. Expansion continued thereafter until an entire floor was occupied at this address.
By 1947, after plaintiff had taken over all assets and liabilities and activities of Scripture Press, Inc., the organization occupied the fifth and sixth floors of 800 North Clark Street, or about 17,000 square feet, and about 5,000 square feet of basement area in the same building. Plaintiff then moved to 434 South Wabash Street, Chicago, Illinois, where about 27,000 square feet of space was occupied. In November 1956 plaintiff moved its operations to its new building in Wheaton, Illinois, about 26 miles west of Chicago.
27. Table I herein reflects the progress of operations of Scripture Press, Inc. as shown by its net sales, income or loss, income taxes paid, surplus or deficit, and cash balance fo,r each of the calendar years and parts thereof from July 1, 1934, to May 31, 1945, on which latter date the company was dissolved and all of its assets and liabilities were distributed to plaintiff.

*497

*498 28. In addition to Sunday School teaching manuals and lesson materials, Scripture Press, Inc., published a magazine, first known as the Church School Promoter, later the Sunday School Builder, and finally, Sunday Magazine. This publication was among the assets acquired by plaintiff.
At a special meeting of plaintiff’s members on October 31, 1945, it was reported that a considerable time before plaintiff was organized, an understanding had been reached between Scripture Press, Inc., and Messrs. Walker and Cory that the magazine Sunday would be made a separate enterprise in which Mr. Walker would have a one-half interest. It was considered that the magazine had no essential connection with plaintiff’s operations and was an enterprise apart from plaintiff. It was agreed that the operation of the magazine be turned over to a corporation to be organized by Messrs. Walker and Cory.
29. Victor E. Cory and Robert A. Walker organized an Illinois corportion called the Sunday Magazine, Inc., with 100 shares of capital stock at $10 per share. Mr. Cory subscribed to 49 shares, and Mr. Walker to the other 51 shares. All personnel, furniture and equipment in this magazine department of plaintiff, together with the subscription accounts and obligations on prepaid subscriptions, were transferred by plaintiff to this new corporation effective November 1,1945.
There was no cash involved in the transfer of the magazine department. The new corporation, however, assumed plaintiff’s obligations of $13,191.04 on prepaid unexpired subscriptions to the magazine, and received accounts receivable and furniture and fixtures of $4,058.83. Plaintiff thus realized a net reduction of its liabilities by $9,132.21.
30. Sunday Magazine, Inc. continued the publication of the magazine, the name of which later became Christian Life, under the management of Mr. Walker. It subleased office space from plaintiff at 434 South Wabash Avenue and remained in Chicago after plaintiff moved its operations to Wheaton, Illinois. Mr. Walker headed plaintiff’s dissemination division until plaintiff moved from Chicago. Thereafter he was fully engaged in the publication of Christian Life magazine.
Mr. Cory participated somewhat in the publication of *499 Christian Life and received an annual salary of $2,400 from such operations until 1955. His duties consisted largely of conferences with the editorial and business staffs on finances, purchases and personnel. Pie no longer has any official connection with tins magazine work.
31. Plaintiff’s members had various substantial reasons for disposing of the magazine operations. The magazine department had operated at a deficit for several years. Its operations required monthly deadlines, whereas plaintiff’s Sunday School publications were issued quarterly. The magazine carried paid advertisements, which practice was incompatible with plaintiff’s operations.
After disposing of the magazine operations, however, plaintiff was interested in the continued publication of the magazine because it was an excellent medium for advertisement of plaintiff’s Sunday School materials. Plaintiff continued to advertise in Christian Life as well as several other religious publications. Plaintiff contributed to the maintenance of the Sunday School section of the magazine because it was a leading evangelical publication which afforded plaintiff the means to advance its purpose of promoting and developing the Sunday Schools.
32. Victor E. Cory and his wife, Bernice T. Cory, were the persons primarily responsible for the organization of the Scripture Press, Inc., and the eventually successful pursuit of its purposes and objectives. Neither of them was a theologian or ordained minister. However, both were devout Christians of the Evangelical Protestant Faith, and both of them developed a missionary zeal to promote and develop the effective teaching of the Bible in the Sunday Schools.
Mr. Cory graduated in 1915 from Heidelberg College at Tiffin, Ohio, with a degree in liberal arts. During his undergraduate years, he served on the staff of the college newspaper, being its business manager in his senior year. Upon his graduation, he was awarded a fellowship in engineering at Case School of Applied Science at Cleveland, where he was graduated as an electrical engineer in 1919. He later completed post-graduate courses in engineering at the University of Michigan.
*500 Throughout bis youth and during his college training, Mr. Cory was active in the Sunday School, Epworth League, and other organizations for young people in the Methodist Church. After completion of his college career, he pursued religious studies at the Moody Bible Institute, Chicago, Illinois, one or two evenings per week for a period of eight to ten years.
Mr. Cory was successfully employed as an electrical engineer with the Commonwealth Edison Company of Chicago from 1919 to 1925. During this period he first attended the North Side Congregational Church of Chicago, where he taught Sunday School and was active in youth organizations of this church. Later he attended the North Side Gospel Center where he became superintendent of the Sunday School. He met his wife at the Congregational Church, and they were married in June 1922. For several years, Mr. and Mrs. Cory together conducted religious mass meetings on downtown streets in Chicago, visited and prayed with hospital patients, and conducted Gospel campaigns from door to door, averaging about four evenings per week in such religious work.
As a result of his own experiences and contacts with other religious leaders, Mr. Cory came to the realization in time that there was a great need for improvement in the teaching techniques and materials for Bible instruction in the Sunday Schools.
33. In 1925, at the suggestion of Evangelist Paul Bader, Mr. Cory left his engineering position and became manager of the Tabernacle Publishing Company, publishers of religious song books. By merger this company later became Hope Publishing Company. Mr. Cory remained in this work for about three years. He realized no monetary gain in leaving the engineering profession, but both he and Mrs. Cory felt strongly that he should take the opportunity to work directly in Christian service.
In 1928, shortly after the merger, Mr. Cory left Hope Publishing Company and became assistant manager of the Bible Institute Colportage Association, which later became known as the Moody Press, an integral part of the Moody Bible Institute. This organization published religious *501 books, and Mr. Cory engaged in its editorial and sales work for about four years. His employment was terminated in 1932 by reason of the discontinuance of book publishing and curtailment of other activities.
34. During his work with the Moody Press, Mr. Cory became closely acquainted with Dr. Clarence H. Benson, who had become chairman of the Christian Education Department of the Moody Bible Institute after many years of service. Dr. Benson was a recognized leader in Christian education and author of a number of books in that field.
Over a period of several years Dr. Benson had written and developed the graduated curriculum of Bible studies for children, previously mentioned in finding 23. Dr. Benson submitted these teaching and lesson materials to Moody Bible Institute for publication, but they were rejected. Shortly thereafter Mr. Cory entered into an agreement to publish this course, and Scripture Press, Inc., was organized in 1932 to accomplish this purpose.
Dr. Benson was for several years engaged with Scripture Press, Inc., in charge of the editorial work on these lesson materials. He was never an officer or salaried employee, but was compensated by way of royalties on the sales and distribution of his compositions. Although no longer obligated to do so, plaintiff continued royalty payments to Dr. Benson for some period of time. His only connection with plaintiff was services as a lecturer at Sunday School meetings and conventions, sponsored by plaintiff.
35. Mrs. Bernice T. Cory was graduated with a Ph. B. degree from the University of Chicago, and thereafter taught English in the Oakland, Illinois, high school for one year before her marriage. She attended evening classes at the Moody Bible Institute, attended Sunday Schools all of her life, and otherwise engaged extensively in religious activities.
Mrs. Cory participated in the editorial work early in the activities of Scripture Press, Inc., and increased such participation until eventually she became the chief editor of plaintiff’s materials. She conducted research in educational curricula, and studied the latest methods and techniques of teaching employed in public schools. She was primarily responsible for plaintiff’s program of revision of its Sunday School materials from time to time to include applicable *502 current events and incorporate new and improved methods, including use of visual aids such as suede graphs and gospel graphs. Mrs. Corj was designated assistant treasurer of plaintiff’s predecessor until 1944 when she became vice president.
36. The annual salaries of the officers of Scripture Press, Inc., commencing with the year 1936 and to and including May 31, 1945, the date of dissolution of the corporation, including the salary of Mrs. Cory as office editor, were as follows:

Years Viator E. Gory, Bernice T. Gory, L. B. Tucker, President Office Editor Treasurer

1936 _ $4,939.27 _ $1,820. 00
1937 _ 3, 523.13 $1, 335. 95 1, 808. 35
1938 _ 7,200. 00 250. 00 2, 000.18
1939 _ 7,225.00 _ 2,125.25
1940_ 9, 625.00 _ 2,314.25
1941_ 7,225. 00 2,400. 00 2, 629.25
1942 _ 6,432. 59 2, 400. 00 2, 604. 00
1943 _ 7,200. 00 2,400. 00 2, 604.00
1944 _ 7,245. 75 2,415.25 3, 044. 50
1945 to 5/31 3,156. 66 3,185. 32 1, 315. 56
No dividends were ever declared or paid to the stockholders of Scripture Press, Inc. By transferring their stock to plaintiff in May 1945, Mr. and Mrs. Cory relinquished their claims to the prior earnings as well as the $4,000 paid in as capital. Mr. Saulnier and Mr. Thomas, directors of Scripture Press, Inc., never received any salaries or other compensation.
37. The primary objectives and activities of plaintiff were first conceived and practiced through operation of Scripture Press, Inc. In addition to publication of the Sunday School lesson materials, Scripture Press, Inc. provided some instructional sessions for Sunday School teachers and representatives at religious conventions, workshops and seminars. This work was performed at that time almost exclusively by Mr. and Mrs. Cory. Scripture Press, Inc., made some cash and merchandise grants to various religious organizations and institutions. These grants were small because of the need for working capital in the operations. During the ten years ended May 31, 1945, cash donations amounted to $2,160.29. At no time during this period was the cash balance adequate for large donations.
*503 Scripture Press, Inc., operated a bookstore in Chicago, which was continued by plaintiff. This bookstore was operated primarily for the convenience of local ministers and Sunday school representatives in obtaining plaintiff’s publications and allied religious materials.
38. All members, officers, directors and most of the employees of plaintiff and its predecessor corporation were and are adherents of the evangelical theology of the Protestant faith. Evangelicals believe in the conservative or literal acceptance of the Bible as the word of Cod, as distinguished from the belief in a more liberal interpretation. Evangelicals do not constitute any particular church or any particular denomination, but are found within many of the protestant organizations. Plaintiff is not an institution of any church and has no affiliation, direct or indirect, with any religious denomination or church.
The National Association of Evangelicals is the national organization of believers of the evangelical theology. Affiliated with that association is the National Sunday School Association. Plaintiff is not an affiliate of either of these organizations, but did take part in 1946 in the organization of the National Sunday School Association, donating the first office furniture and providing its first secretary. Mr. Cory has served on its executive committee and served as its official secretary and treasurer.
Plaintiff’s members or trustees, Which constitute its board of directors, are a self-perpetuating body, empowered to select new or successor members. The membership was so constituted in order that the religious principles and objectives of plaintiff’s founders would be continued throughout plaintiff’s existence.
39. All employees of plaintiff and its predecessor corporation were and are required to be devout Christians and also otherwise qualified for the work to be performed. They must have church affiliations, but not restricted to any particular denomination. Plaintiff’s employees actually represent fifteen to twenty different denominations. Before commencing each working day, all employees of plaintiff and its predecessor were expected to and did join in morning prayer and worship. By 1945 Scripture Press, Inc., had about 140 people in its employ, and by 195V plaintiff’s *504 employees bad increased to approximately 240 individuals. Many of plaintiff’s employees are either graduates of religious seminaries or institutes o,r students continuing tbeir religious studies.
40. The transfer of the business of Scripture Press, Inc., to plaintiff involved no change in location, personnel, policies, finance or activities, except that thereafter rapid growth occurred. The Corys and their associates continued to advance their fundamental purpose of improving Sunday Schools by providing better teaching and lesson materials. Other means of promoting and improving Sunday Schools were expanded by plaintiff as growth and development occurred in its operations.
In the fall of 1944, Mr. Cory discussed company tax problems with Mr. Glenn Ingram, a certified public accountant, who had previously handled audits for Scripture Press, Inc. Mr. Ingram had known Mr. and Mrs. Cory since '1921 when he had participated with them in church activities, and was well acquainted with their objectives. He was advised of the plans to expand the program of free instruction and training for Sunday School teachers, to be financed in part by public solicitation of funds. Mr. Ingram advised Mr. Cory that all contributions to Scripture Press, Inc., would be subject to tax as income of the company, and that the company’s costs expended in providing instructors and donating materials at meetings of Sunday School teachers and representatives might be construed as charitable contributions, along with other donations and cash gifts, in which event the company’s income tax situation would become complicated by the existing limitation of such contributions for tax purposes to five percent of net income. Mr. Ingram recommended that consideration be given to the organization of a tax exempt foundation for the advancement of religious education. Thereafter, plaintiff was organized as herein-before stated in these findings.
Plaintiff made only one public drive for funds, which occurred in December 1946. Solicitations were made by mail, and plaintiff realized approximately $1,000 in donations.
41. Plaintiff functions through an executive committee, consisting of plaintiff’s president, secretary, and the heads *505 of each of its operating divisions. All policies, functions and matters of administration are determined by unanimous consent of this committee, with approval of the board of directors. Any proposed action lacking approval of all members is deferred until unanimous agreement is reached.
Division heads are selected by unanimous approval of the executive committee. Necessary qualifications of any prospective appointee' are that he must have the same doctrinal beliefs of plaintiff’s officers and members, sufficient educational background and experience to fill the position, and active affiliation with a church and Sunday School. Being .informed of plaintiff’s principles and practices, any appointee is expected to conform thereto, including participation in the daily worship and prayer'meetings. Such person is expected to practice total abstinence from the theater and from the use of tobacco and alcoholic liquors. Each meeting of the executive committee, as well as any meeting of the members or board of directors, is opened with prayer.
42. The salaries of plaintiff’s officers and executive heads are determined and fixed by the board of directors, by unanimous consent, and upon consultation with plaintiff’s auditor, Glenn Ingram, as to what would be fair and reasonable compensation. It has been the established policy never to pay a newly employed official greater compensation than that of his prior employment or ministry.
The salaries of plaintiff’s principal officers for the years 1946 through 1955 were as follows:

V. JS. Gory, B. T. Gory, B. A. Walker, R. A. Ginter, Year President Y.P. £ Treasurer Vice President Controller

1946 -_$10, 049.62 $6, 032. 76 $4, 317.10 _
1947 _ 12,232.60 8,084.00 7,287.00 $6,644.00
1948 _ 15,059.70 10,022.40 9,030.60 9,030.60
1949 _ 16,473.30 11,071.20 10,079.40 10,079.40
1950 _ 17,920.20 12,106.40 11,145.20 11,145.20
1951_ 18,925.80 13,122.00 12,150.80 12,150.80
1952 _ 20,172.20 13,800.00 13,397.20 13,397.20
1953 _ 21, 370. 00 14, 620. 00 14, 620. 00 14, 620. 00
1954 _ 22,653.00 15,878.00 16,094.00 *13,210.00
1955 _ 24, 600. 00 17, 600. 00
Dr. Cook, who replaced Mr. Walker about February 1,1957, was retained at a salary of $15,000 per year. The above- *506 stated salaries of Mrs. Cory include some payments of royalties for use of her visual aid creations as supplementary* lesson material. She is the only salaried employee who received any royalty payments. In addition, the Corys received compensation over a period of time of $25 per month for use by plaintiff of a room in their home as an office, library, and conference room.
The compensation to plaintiff’s officers was fair and reasonable and commensurate with the duties performed by them.
43. Plaintiff has five operating divisions: (1) Editorial Division, headed by Bernice T. Cory; (2) Dissemination, headed by Dr. Robert A. Cook; (3) Production, headed by William O. Hall; (4) Finance, headed by Wendel Anderson, and (5) Personnel, headed by Wilfred Frykman.
The editorial division creates most of plaintiff’s publications, and edits all material published by it. Some material is written on outside assignments. The dissemination division promotes the sale of materials through mailing lists, distribution of catalogs, advertising in religious magazines, and the operation of two bookstores, one in downtown Chicago, and the other in plaintiff’s Wheaton building. The production division handles arrangements for the printing of plaintiff’s materials by outside printing companies, purchasing of materials and supplies, and the receiving and shipping of orders. The finance division handles all finance and accounting, and credits and collections. The personnel division handles the screening and hiring of employees and all other personnel matters, including the prayer and worship sessions at the commencement of each day’s work.
44. Within its dissemination division, plaintiff has an instructional department, sometimes referred to as the convention department, headed by Reverend Sherman Williams. This department was first organized as such shortly after plaintiff took over the operations of the predecessor corporation, the department staff consisting then of only one person and a secretary who were assisted by officials and employees of other departments. Plaintiff conducted a series of instructional sessions in Chicago, consisting of about five sessions per year, at which 200 to 600 ¡Sunday *507 School representatives were in attendance. When Bever-end Williams became director of this department in July 1955 the staff consisted of three faculty members and a secretary.
By October 1957, the faculty of this department consisted of three ordained ministers, two women with masters degrees in religious education, an office secretary, and a part-time representative on the Pacific Coast. It continued to use personnel of other divisions in the instructional work. In 1957, some fifteen employees in the editorial division, qualified to conduct instructional courses, were participating under the direction of the instructional department in those activities. In addition, plaintiff has made the arrangements and paid the expenses of various ministers and religious educators to participate in such meetings and conventions.
In 1957 plaintiff arranged and conducted seminars for pastors and workshops for Sunday School teachers in its own building. During the same year plaintiff’s representatives and sponsored speakers and instructors participated in some 244 conventions, seminars, institutes, and workshops relating to religious education.
The fundamental purposes of these activities are to stimulate the interest of Christian leaders and teachers in improved techniques and methods of Sunday School teaching, to train and instruct Sunday School teachers in such techniques and methods, and thereby to promote and improve the Sunday Schools and accomplish an effective teaching of the Bible to children.
Besides providing instructors and speakers for religious meetings, seminars, institutes, and conventions, both regional and national, plaintiff, through its instructional department has assisted particular churches in development programs for Sunday Schools, and provided speakers in Christian education classes in schools and colleges of religion, and counselled Sunday School representatives by mail and telephone, providing booklets on Christian education, and more recently has created and made available a series of motion pictures and film strips concerning Sunday School teaching.
All materials employed by plaintiff in connection with these instructional courses and sessions are provided without charge. Plaintiff does not conduct a sales program in *508 connection with, sucb meetings, although, at some conventions plaintiff has an exhibit of its materials as do other organizations.
45. The National Sunday School Association held twin conventions in 1957 at Los Angeles, California, and Grand Rapids, Michigan, at which about 9,000 ministers, teachers and church leaders were in attendance. Plaintiff provided about one-fourth of the speakers and instructors, including members of its own faculty, and paid all of their travel and other expenses in connection therewith. Both Mr. and Mrs. Cory attended the Los Angeles convention. Thereafter, Mrs. Cory by invitation conducted a series of instructional courses on Sunday School teaching in individual churches at several locations in California.
Mr. Cory at plaintiff’s expense has attended three of the latest world congresses of Youth For Christ International, one in Brazil, one in Venezuela, and the latest in August 1957 in Copenhagen, Denmark. Plaintiff also paid the expenses of the Palermo brothers, two noted evangelists, to conduct religious meetings at Sao Paulo, Brazil.
While in Europe, Mr. Cory visited England and various continental countries in the interest of Sunday School work. Plaintiff now employs a resident European representative to promote development of the Sunday Schools there, at a cost of about $3,000 per year.
46. Plaintiff’s editorial division consists of four separate departments with a combined staff of eighteen writers, and in addition, plaintiff from time to time employs free lance writers. Extensive research is continuously conducted by the editorial division to improve plaintiff’s publications.
Plaintiff’s principal publications are the' graduated Sunday School teaching and lesson materials known as the All Bible Graded Sunday School Lessons and the Sunday School summer school course known as All Bible Vacation School Lessons. In addition plaintiff publishes a large number of religious pamphlets, booklets and other supplemental teaching and lesson materials, and designs and provides various types of visual aids for teaching purposes.
Except for Mrs. Cory, the only royalty payments made by plaintiff have been to outside writers. Mrs. Cory received *509 royalties of $1,393.65 during 1953; $1,895.70 in 1954; and $1,457.55 in 1955 on the sales of visual aids created by her.
47. Plaintiff’s dissemination divison handles the sale and distribution of plaintiff’s publications, as well as other printed materials and merchandise obtained by plaintiff through direct purchases for resale. Plaintiff’s 1957 catalog lists for sale its ten different groups of religious teaching materials, covering the age groupings from infancy into adulthood, and also its numerous other publications such as pamphlets and booklets. In addition, the catalog lists publications and merchandise purchased by plaintiff for resale, such as numerous religious books for all age levels, Bibles, Bible cases, religious song books, greeting cards, stationery, gifts, toys, games, handcraft supplies, records, films and filmstrips, projectors, a tape recorder, a record player, flags, chairs and tables. Plaintiff purposely handled a line of merchandise sufficiently complete so that Sunday Schools could obtain most of their requirements at one place. Most of the merchandise carried a religious theme, marking or Scriptural reference.
Sales are promoted by plaintiff, mainly through use of mailing lists of Church Sunday Schools throughout the country and through issuance of catalogs. Plaintiff advertises its publications in some twelve religious magazines.
Sales are also conducted by plaintiff in its two stores, one in downtown Chicago and the other in its Wheaton building. Store sales for the fiscal years ended January 31, 1949 to 1956 amounted to about $749,525, representing about 5.13 percent of plaintiff’s total net sales for these eight years. Some of plaintiff’s sales are made to outside bookstores and to individuals, but such sales amount to less than one percent of the total sales. Approximately 94 percent of plaintiff’s sales are made directly to Sunday Schools throughout the country.
About 26,000 Sunday Schools use plaintiff’s lesson materials and other items, representing about 75 different Protestant denominations and more than 3,000,000 Sunday School pupils. Many thousands of pastors, ministers, Sunday School teachers and other religious leaders receive instructional training directly or indirectly from plaintiff’s *510 programs. Substantial grants of lesson materials are made by plaintiff to newly formed Sunday Schools and other organizations unable to pay for such materials.
48. A summary of plaintiff’s operating statements for each of the fiscal years ended January 31,1951 to 1957, is reported herein in Table II. Complete operating statements for the fiscal years 1946 to 1950 were not placed in evidence. However, data for those earlier years show the following information with respect to plaintiff’s total net sales, contributions received, merchandise grants and cash donations, and net income, for each of the fiscal years ended as indicated:

Fiscal year ended Total Net Sales Merchandise Grants Contributions <£ Cash Net Received Donated Income

2-28-46_ $411,755.43 _ $2,239.98 ( — 22,751.73)
1-31-47_ 746, 519. 82 $736.13 4, 413.73 80, 350. 50
1-31-48_ 972, 618.58 1,436. 09 17,302. 86 94,369. 83
1-31-49_ 1,119,340.02 1,568.22 26,751.12 9,897.51
1-31-50_ 1,230,374.48 1,666.48 11,282.81 150,787.78
After January 31, 1950, plaintiff’s operations continued to expand as shown in Table II.
Approximately 85 percent of plaintiff’s total net sales (during all seven of the fiscal years shown in Table II) represent plaintiff’s own productions, consisting of Sunday School teaching and lesson materials and supplemental publications and materials. About 15 percent of the total of these net sales consist of Bibles, books, other publications, and numerous items of merchandise, which are purchased for resale by plaintiff from outside sources. Plaintiff’s officers testified in this case that little or no profit is realized by plaintiff in handling such outside materials. By allocating plaintiff’s overall operating and selling expenses to each of these groups of sales in accordance with the ratio between the net sales of each group, it is shown that a net loss was sustained by plaintiff on those items acquired from outside sources. Throughout the seven-year period, however, plaintiff averaged net income or profit from all of its operations at a rate of about 8.7 percent of total net sales.
The items in this finding and in Table II, designated as contributions received, were not receipts from any solicitation of public funds, but were honorariums received from *512 some of the various churches and other groups where plaintiff furnished speakers or instructors.

*511

*512 With respect to the item of merchandise grants and cash donations, referred to in this finding and in Table II, the evidence in this case shows that in each year the value of merchandise granted was substantially greater than the cash donated by plaintiff. For the tax year ended January 31, 1953, the total figure of $31,951.89 is comprised of cash donations by plaintiff of $9,499.90 and the balance in merchandise grants.
49. Plaintiff’s audit reports summarized in Table II fail to reflect the total costs incurred by plaintiff for its instructional work at Sunday School meetings and conventions and other sessions. This was due to the fact that the audits were conducted in accordance with the account classification employed by plaintiff. Plaintiff’s records reflect approximate expenditures by plaintiff in its educational programs during seven fiscal years as follows: 1951, $21,835.67; 1952, $29,434.83; 1953, $36,452.08; 1954, $41,454.42; 1955, $46,378.63; 1956, $48,041.44; and 1957, $72,886.27.
50. Plaintiff’s annual audit reports combine its store operations with its other sales and activities.
During the fiscal years ended January 31, 1949 to 1956, during which period plaintiff operated only its downtown Chicago store, as it had not yet opened operations in its Wheaton building, plaintiff’s total store sales amounted to $749,525, and its net income therefrom approximated $66,857.95. About 48 percent of these store sales were plaintiff’s own publications, and the remaining 52 percent were catalog items purchased from others. The net income from such sales of plaintiff’s own products amounted to $72,185.08, whereas a net loss was sustained on other materials of about $5,327.13.
51. Plaintiff’s financial condition as of February 28,1946, and at the end of each fiscal year ended J anuary 31, 1947, to 1957, is set forth in Table III herein, which is a summary of financial statements for those years. The accumulated capital and surplus at the end of fiscal year 1957 amounted to $1,610,817.30, all of which represents plaintiff’s *513 earnings since June 1, 1945, except about $30,000 received from its predecessor. The accumulated capital and surplus at the end of fiscal year 1953 amounted to $744,798.26; and at the end of fiscal year 1954 to $982,580.70.

*0

*513 At a meeting of plaintiff’s board of directors on May 29, 1950, it was resolved that $200,000 be transferred from the earned surplus account to the capital account, and the basis for this action was recorded in the minutes to be “that the increasing volume of sales had made it advisable that the Foundation have an established, secure and increased working capital in order to continue the efficient operation of its business.”
Plaintiff’s board of directors on April 17,1951, transferred an additional $170,000 from surplus to the capital account, increasing capital to $400,000, and it was recorded in the minutes that “said capital and future earnings to be conserved for the purpose of erecting the Foundation’s own building in order to better carry on its operations and planned objectives, including the conduct of a Sunday School Institute for free instruction to Pastors, Sunday School Superintendents and Teachers.”
On June 15, 1953, the Corys purchased about 2.5 acres of land ajoining the town of Glen Ellyn, near Wheaton, Illinois, at a cost of $6,500. The Corys purchased this land to prevent its sale to others and in order to have it available for plaintiff pending selection and purchase of a site for plaintiff’s building. Plaintiff thereafter purchased adjacent land, and with the approval of the board of directors, the Corys about September 30, 1955, sold and transferred their Glen Ellyn parcel to plaintiff at a price which was $1,000 in excess of the price previously paid by the Corys for the land. The price was fixed on the recommendation of plaintiff’s auditor that the Corys would thus be reimbursed carrying charges and other expenses incurred by them in connection with the land.
52. Plaintiff’s new building at Wheaton, Illinois, was completed about November 1956, at a total cost in excess of $1,000,000. Plaintiff expended $488,000 for the land and a substantial part of the construction costs. The balance of *514 the costs was financed by plaintiff’s issuance of a mortgage of $600,000 on the land and improvements, payable over a period of 15 years at $40,000 per year, plus interest at 4.75 percent. Almost one-half of its income for the fiscal year ended January 31, 1957, was required to service this mortgage. As of January 31, 1957, the remainder of plaintiff’s accumulated earnings, except its cash balance and investment in Government bonds, was represented by accounts receivable, inventories, and other assets necessary for successful operations. As of the same time, its cash holdings amounted to $62,099, and with its $80,000 investment in Government bonds, plaintiff was in a position to liquidate most of its current liabilities. After the financing of its new building, plaintiff had adequate, but not excessive working capital for the current volume of business being performed.
53. Plaintiff’s new building is distinguishable from industrial or commercial construction in that it was planned and designed to provide for its educational objectives. In addition to facilities for the publication and dissemination of plaintiff’s literature and other materials, the building contains a chapel or assembly room for religious meetings to accommodate about 500 people, and a substantial number of classrooms or meeting rooms for smaller groups. The building has a church-like tower which is kept lighted at night. The building has been used regularly for conducting seminars for pastors and instructional sessions for Sunday School representatives. The plaintiff’s employees hold their daily worship sessions in the chapel.
Plaintiff’s building occupies about 4 acres of its 11-acre tract of land, and plaintiff has taken options to purchase contiguous land. Plaintiff’s projected building plans call for the construction of dormitories and related facilities for the free housing and care of pastors, Sunday School teachers, and other church leaders in attendance at seminars and instructional meetings on plaintiff’s premises.
54. The need for continued improvement in the training of Sunday School teachers and administrators is abundantly shown in the record of this case. Seminars and colleges of religion generally have not adequately prepared ministers, *515 pastors and religions leaders for effective administration of the Sunday Schools. Most Sunday School teachers are lay members without adequate training for such assignments. Many of the smaller denominational churches have no publishing house or other agencies to assist them in such work.
Sunday School attendance in the United States declined by about 6 million between 1925 and 1945, but since 1945 has increased about 10 million. Q.uidnessett Baptist Church of East Greenwich, Ehode Island, has used plaintiff’s teaching and lesson materials exclusively since 1946, and sinc8 that time its Sunday School attendance has increased 700 percent, whereas the population increase in its area has been 150 percent. Plaintiff has received numerous reports and indorsements of the quality and effectiveness of its materials.
It is reasonable to conclude that plaintiff has made a substantial contribution to the growth and development of the Sunday Schools in the United States.
It is the opinion of a number of outstanding religious leaders, who appeared and testified for plaintiff in this case, that plaintiff was and has been engaged in the ministry of religious education, and they likewise expressed the opinion that the predecessor corporation was similarly engaged.
55. The great majority of Sunday School lesson and teaching materials are published by denominational publishing houses, boards or other organized agencies of churches, and all of such publishing organizations are ruled tax-exempt by the Commissioner of Internal Bevenue. All of such denominational publishing houses are controlled directly or indirectly by churches or church organizations, and any profits realized by them go to such churches or church organizations. One of the largest is the Methodist Publishing House of Cincinnati, Ohio, the income of which supports the pension fund of Methodist ministers. The Baptist Publishing Committee, comparable in size to the Methodist Publishing House, provides religious literature for Baptist Churches, although individual churches are free to use other materials.
*516 Other such denominational press organizations, exempt from Federal taxes, are the Christian Board of Publication, Inc., also known as the Bethany Press, publishing for churches of Disciples of Christ; the Concordia Publishing House for the Evangelical Lutheran Synod of Missouri; the Otterbein Press for the Church of the United Brethren of Christ; the Nazareno Publishing House for the General Assembly of the Pentacostal Church of the Nazareno; the Gospel Trumpet, Inc., known as the Warner Press, for the General Assembly of the Church of God; and the Seabury Press, Inc., for the Protestant Episcopal Churches of the United States.
There is no substantial evidence in this case that any commercial printing companies, operating as profit organizations, produce and sell Sunday School teaching and lesson materials comparable to those of plaintiff, or engage in any religious educational programs.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed insofar as it claims an exemption under section 101(6) of the Internal Revenue Code of 1939, sufra. The case will be remanded to the trial commissioner for farther proceedings on plaintiff’s remaining claims.

 Section 101(6) of tlie Internal Revenue Code of 1939, 53 Stat. 33, as amended by § 301(c)(1), Revenue Act of 1950, 64 Stat. 906, 953, and by § 314(b)(1), Revenue Act of 1951, 65 Stat. 452, 492.

 As added by § 301(a), Revenue Act of 1950, 64 Stat. 906, 948, and amended by § 201(d), Excess Profits Tax Act of 1950, 64 Stat. 1137, and § § 121 (e) and 339 (a), Revenue Act of 1951, 65 Stat. 452.

 As added by § 301(a), Revenue Act of 1950, 64 Stat. 906, 948.

 68A Stat. 163.

 68A Stat. 170.

 Section 101(6) of the Internal Revenue Code of 1939, 53 Stat. 33, 26 Ü.S.C. §101(6) (1952 ed.), as amended by § 301(c)(1), Revenue Act of 1950, 64 Stat. 906, and by § 314(b)(1), Revenue Act of 1951, 65 Stat. 452, 492, reads as follows :
“EXEMPTIONS PROM TAX ON CORPORATIONS
“Except as provided In paragraph (12) (B) and in supplement U, the following organizations shall be exempt from taxation under this chapter—
* * * * *
“(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation. Eor loss of exemption under certain circumstances, see sections 3813 and 3814; * * *”

 The successor to § 101 (6) of the Internal Revenue Code of 1939 is § 501 (c) (3) of the Internal Revenue Code of 1954, 68A Stat. 163, which reads as follows :
“(c) LIST OP EXEMPT ORGANIZATIONS.-
*****
“(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.”

 Tliese amounts are set out in our finding 49. The gross income and total expenditures are set out in finding 48. This finding will show the very small role expenses for religious education occupied in the whole picture of the taxpayer’s total expenses.

 The accumulated capital and surplus figures for each year are obtained by totaling the annual accumulated earnings and capital fund amounts set out in Table III in the trial commissioner’s findings. See our finding 51,

 On this point — the significance of the large amounts aggregated by the plaintiff — the remarks of the United States Court of Appeals for the Ninth Circuit in Randall Foundation v. Riddell, 244 F. 2d 803 at 807 (9th Cir. 1957), a case not directly in point on the facts but nonetheless involving a construction of §101(6), are certainly apposite:
“It is not our intention to say that a case can never be made out on the facts of a particular situation for aggregation of funds by a corporation for ultimate disposition to a charitable purpose. But a corporation which in its inception engages in trade, business * * *, and only has a vague charitable design, does not in our opinion come within the terms of the statute.”

 At this point it should be remembered that there are many commercial concerns which sell Bibles, scrolls, and other religious and semi-religious literature which have not been granted exemption as to that part of their businesses.

 Mr. R. A. Ginter died in late 1954.